UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES INVESTOR PROTECTION CORPORATION,

Plaintiff,

-v-

BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

Defendant.

In re:

MADOFF SECURITIES

PERTAINS TO:

Consolidated proceedings on 11 U.S.C. § 502(d)

12-mc-115 (JSR)

OPINION AND ORDER

7/1/14

JED S. RAKOFF, U.S.D.J.

Section 502(d) of the Bankruptcy Code, 11 U.S.C. § 502(d), reads as follows:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . . of this title or that is a transferee of a transfer avoidable under section . . . 544, 545, 547, [or] 548 . . . of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable . . . .

In the instant consolidated proceedings, Irving Picard (the "Trustee"), the trustee appointed under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa-78*lll*, to administer the

estate of Bernard L. Madoff Investment Securities LLC ("Madoff Securities"), has brought claims for disallowance of creditor claims under section 502(d) against various defendants in adversary proceedings in the Madoff Securities liquidation. The Court assumes familiarity with the underlying facts of Madoff Securities' fraud and ensuing bankruptcy and recounts here only those facts that are relevant to the instant issues.

As a general matter, a SIPA trustee is "vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under Title 11." 15 U.S.C. § 78fff-1(a). What makes a SIPA bankruptcy different from a run-of-the-mill bankruptcy is, among other things, that SIPA empowers a trustee to recover and distribute to the debtor broker-dealer's customers "customer property," defined as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted." 15 U.S.C. § 78*lll*(4); see also 15 U.S.C. § 78fff-2(c)(3). For our purposes, Madoff Securities' transfers of customer property were primarily payments to other customers of fictitious "profits" as part of Madoff Securities' efforts to perpetuate its fraud.

As the Trustee collects customer property, customers of the debtor broker-dealer may submit a "written statement of claim" to the Trustee, id. § 78fff-2(a)(2), and the Trustee is required to

"promptly discharge" such "net equity claims" from the customer property estate. See id. § 78fff-2(b). A "customer's 'net equity' [is] calculated by the 'Net Investment Method,' crediting the amount of cash deposited by the customer into his or her [Madoff Securities] account, less any amounts withdrawn from it." In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 233 (2d Cir. 2011). Thus, a customer who withdrew less than he deposited over the course of his investment with Madoff Securities has a net equity claim and may be entitled to disbursements from the customer property estate for the amount of that net equity. Such customers are also entitled to receive an "advance" from the Trustee, paid by the Securities Investor Protection Corporation ("SIPC"), up to a certain amount, "as may be required to pay or otherwise satisfy claims for the amount by which the net equity of each customer exceeds his ratable share of customer property." 15 U.S.C. § 78fff-3(a).

The defendants in the instant consolidated proceeding are individuals and entities who have filed net equity claims with the Trustee – that is, they are Madoff Securities customers who have received in withdrawals from their Madoff Securities accounts less than they initially invested, and they seek compensation from the Trustee for the remainder of their principal. The Trustee contends, however, that these defendants received avoidable transfers from Madoff Securities, which, under section 502(d) of the Bankruptcy Code, must be returned to the Madoff Securities estate before their net equity claims may be satisfied. See 11 U.S.C. § 502(d)

(requiring courts to disallow "any claim of any entity from which property is recoverable . . .or that is a transferee of a transfer avoidable . . . unless such entity or transferee has paid the amount . . . for which such entity or transferee is liable"). The Trustee has therefore refused to pay to these defendants either a SIPC advance or the interim distributions that has been made to other net equity claimants since this liquidation proceeding began.

To take one example, Cardinal Management, Inc., is a foreign investment fund that was a customer of Madoff Securities before its collapse. See Decl. of Jeff E. Butler dated July 13, 2012 ("Butler Decl."), Ex. 1, (Complaint in Picard v. Cardinal Mgmt., Inc., Adv. Pro. No. 10-4287 ("Cardinal Compl.")), ¶¶ 18, 20, No. 12 Misc. 115, ECF No. 233-1 (S.D.N.Y. July 13, 2012). Between July 2005 and December 2008, Cardinal invested approximately $124 million with Madoff Securities and withdrew over $28 million. Cardinal Compl. ¶ 90; Butler Decl., Ex. 2. After Madoff Securities entered into liquidation, Cardinal filed a net equity claim with the Trustee for the difference between what it invested and what it withdrew. Cardinal Compl. ¶ 100. In November 2010, however, the Trustee filed an avoidance action against Cardinal seeking to avoid and recover the $28 million Cardinal received.[1] See id. ¶¶ 102-62. The Trustee

---

[1] In this Opinion and Order, the Court takes no position as to whether the Trustee is entitled to pursue any or all of his avoidance and recovery claims against Cardinal. The only question in the instant proceeding is whether, assuming that the Trustee has valid avoidance and recovery claims against a defendant, he may also state a claim for disallowance under section 502(d).

alleges, inter alia, that Cardinal failed to act in good faith in investing in and receiving transfers from Madoff Securities, and therefore the Trustee contends that he may avoid and recover the entirety of any fraudulent transfers received by Cardinal in the two years prior to Madoff Securities' collapse. See Cardinal Compl. ¶¶ 40-44; 11 U.S.C. § 548(c) (allowing a transferee to retain a fraudulent transfer to the extent the transferee "gave value to the debtor in exchange for such transfer" if the transferee took the transfer "in good faith"). In addition to asserting avoidance and recovery claims, the Trustee included a count for "disallowance of customer claims" pursuant to section 502(d), alleging that Cardinal "is the recipient of transfers of [Madoff Securities] property which are avoidable and recoverable," and that Cardinal has not "returned the Transfers to the Trustee." Cardinal Compl. ¶ 165. Because of this claim for disallowance, Cardinal has not received a SIPC advance or any payments of customer funds.

Cardinal and the other consolidated defendants have moved to dismiss the Trustee's disallowance counts against them. The defendants also moved to withdraw the reference to the Bankruptcy Court, which the Court granted with respect to the question of whether SIPA is incompatible with section 502(d) and requires the dismissal of the Trustee's claims for disallowance of customer net equity claims. See Order at 3, No. 12 Misc. 115, ECF No. 155 (S.D.N.Y. June 1, 2012). The Court received consolidated briefing on this issue from the defendants, the Trustee, and SIPC, and heard

oral argument on October 9, 2012. In a "bottom-line" Order, the Court held that SIPA does not preclude the application of section 502(d) to customer claims against the Madoff Securities estate. See Order, No. 12 Misc. 115, ECF No. 435 (S.D.N.Y. Feb. 12, 2013). This Opinion and Order explains the reasons for that decision and directs further proceedings relating thereto to be returned to the Bankruptcy Court.

As an initial matter, as noted in the Court's bottom-line Order, this Court stated in Picard v. Katz, 462 B.R. 447, 456 (S.D.N.Y. 2011), that section 502(d) "is overridden in the context of a SIPA trusteeship by section 78fff-2 of SIPA." The consolidated defendants thus argue that the Court has already determined that section 502(d) does not apply in any adversary proceedings arising out of the Madoff Securities liquidation, and collateral estoppel and the "law of the case" doctrine preclude the Trustee from re-litigating this issue here. The Court disagrees.

Collateral estoppel precludes re-litigation of issues previously decided against a party when "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." Ball v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006) (internal quotation marks omitted). Although Katz did address the conflict between section 502(d) and SIPA, however

briefly, this issue was at best minimally litigated in the course of the Katz proceeding: argumentation on this point was limited to a few sentences in each party's otherwise extensive submissions to the Court. Cf. Chi. Truck Drivers, Helpers & Warehouse Union (Indep.) Pension Fund v. Century Motor Freight, Inc., 125 F.3d 526, 530 (7th Cir. 1997) (finding that an issue was not actually litigated for purposes of collateral estoppel in part because of "the sparsity of discussion on the . . . issue" and "the rather late emergence of the issue at the reply brief stage"). Moreover, the question of the conflict between section 502(d) and SIPA is purely a question of statutory interpretation - an area in which courts are hesitant to apply collateral estoppel. See, e.g., Envtl. Def. v. EPA, 369 F.3d 193, 203 (2d Cir. 2004) (refusing to apply collateral estoppel because, "where pure questions of law — unmixed with any particular set of facts — are presented to a court, the interests of finality and judicial economy may be outweighed by other substantive policies" (quoting United States v. Alcan Aluminum Corp., 990 F.2d 711, 719 (2d Cir. 1993)). Under these circumstances, the Court finds the application of collateral estoppel principles to this question to be unwarranted.

Furthermore, it is firmly established that the law of the case doctrine "is a discretionary rule of practice and generally does not limit a court's power to reconsider an issue." In re PCH Assocs., 949 F.2d 585, 592 (2d Cir. 1991). Importantly, the doctrine "does not apply if the court is 'convinced that its prior decision is

clearly erroneous and would work a manifest injustice.'" Pepper v. United States, 131 S. Ct. 1229, 1250-51 (2011) (brackets omitted) (quoting Agostini v. Felton, 521 U.S. 203, 236 (1997)). Here, reconsideration of the Court's prior decision is warranted to this limited extent, given the minimal briefing of the section 502(d) issue in that case and because, in light of the fuller briefing now before the Court, the Court is persuaded that its brief prior statement on this point was incorrect.

Accordingly, the Court turns to the parties' contentions on the merits of this issue. The defendants first contend that section 502(d) does not apply to claims filed under SIPA section 78fff-2(a)(2) under a strict reading of section 502's statutory language. According to the defendants' theory, section 502(a) provides for allowance of claims, "proof of which is filed under section 501" of the Bankruptcy Code, the statutory provision under which a pre-petition creditor may file a proof of claim with a bankruptcy estate. 11 U.S.C. § 502(a). Section 502(d) in turn applies "[n]otwithstanding subsections (a) and (b) of this section," suggesting that section 502(d) is likewise limited to claims filed under section 501. A customer net equity claim in a SIPA liquidation is not a claim filed under section 501, argue the defendants, as net equity claims are filed under SIPA section 78fff-2(a)(2). Therefore, under the defendants' reading of section 502, SIPA net equity claims are not eligible for disallowance under section 502(d).

The Second Circuit relied in part on similar reasoning in finding that section 502(d) does not provide for disallowance of post-petition claims for administrative expenses under section 503 of the Bankruptcy Code. See In re Ames Dep't Stores, Inc., 582 F.3d 422, 430 (2d Cir. 2009) (per curiam) ("The plain language thus introduces section 502(d) as an exception to the automatic allowance of proofs of claims under sections 502(a) and (b), and suggests that the subsection's scope is limited to that process and does not extend to claims allowable under section 503."). However, the Second Circuit did not focus solely on this technical distinction. Rather, it looked to, for example, the "structure and context" of the relevant provisions, noting that section 503 creates an independent procedure for the allowance of administrative expenses under section 503 that differs in significant ways from the allowance of creditor claims under sections 501 and 502. See id. at 429. The Ames Court also placed significant weight on the difference between pre-petition and post-petition claims, see id. at 429-31, for which Congress sought to achieve different goals, see id. at 431 ("[M]ore importantly, the Bankruptcy Code gives a higher priority to requests for administrative expenses than to prepetition claims in order to encourage third parties to supply goods and services on credit to the estate, to the benefit of all of the estate's creditors.").

Although SIPA section 78fff-2 is not expressly included within the purview of section 502(a) and (b) of the Bankruptcy Code, that alone is insufficient to exclude customer net equity claims under

SIPA from section 502(d)'s reach. It is, in some sense, unsurprising that section 78fff-2 is not enumerated in section 502(a): SIPA is external to the Bankruptcy Code, even as it borrows from the powers and structures of that Code. See 15 U.S.C. § 78fff(b) (providing that "liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under" the Bankruptcy Code). Starting from the assumption that the Bankruptcy Code's provisions apply absent any indication to the contrary, therefore, the Court reads SIPA's provisions in pari materia with the Bankruptcy Code to determine how customer net equity claims should be treated.

Overlaying SIPA onto the Bankruptcy Code, it is clear that claims brought under SIPA section 78fff-2 are substantively more analogous to creditor claims brought under section 501 of the Bankruptcy Code than they are to claims for administrative expenses under section 503. A statement of claim in a SIPA proceeding is the functional equivalent of a proof of claim in a bankruptcy case: in both cases a trustee has the right to contest a claim, and claims are ultimately resolved by a court. Indeed, to the extent that SIPA otherwise fails to detail the mechanics of the claims process, courts have looked to section 502 of the Bankruptcy Code for guidance, suggesting that these two schemes are generally consistent. See, e.g., SIPC v. Stratton Oakmont, Inc., 229 B.R. 273, 279 (Bankr. S.D.N.Y. 1999) (citing section 502(b) in determining whether an objected-to claim in a SIPA liquidation should be allowed). And, significantly, net equity claims under SIPA section

78fff-2 are pre-petition creditor claims, similar to section 501, not post-petition expenses under section 503, which suggests that Ames's central reasoning does not apply to SIPA customer claims. See Ames, 582 F.3d at 430 ("[S]ection 502(d), like sections 502(a) and (b), ordinarily applies only to prepetition claims.").

Accordingly, in the absence of a conflict between SIPA and section 502(d), section 502(d) applies to customer claims brought under SIPA section 78fff-2. See 15 U.S.C. § 78fff(b) (incorporating chapter five of the Bankruptcy Code, but only "[t]o the extent consistent with the provisions of this chapter"). It is to the defendants' asserted conflicts between SIPA and section 502(d) that the Court now turns. "A provision is 'inconsistent' with SIPA if it conflicts with an explicit provision of the Act or if its application would substantially impede the fair and effective operation of SIPA without providing significant countervailing benefits." SIPC v. Charisma Sec. Corp., 506 F.2d 1191, 1195 (2d Cir. 1974). Here, the defendants contend that disallowance of claims under section 502(d) conflicts with both SIPA's policy goals and its express statutory requirement that the Trustee must "promptly" pay out customer net equity claims.

The defendants point to a number of SIPA's provisions that require the Trustee to "promptly . . . distribute customer property and . . . otherwise satisfy net equity claims of customers." 15 U.S.C. § 78fff(a)(1)(B) (setting forth SIPA's statutory goals); see, e.g., 15 U.S.C. § 78fff-2(b) ("After receipt of a written statement

of claim . . . , the trustee shall promptly discharge . . . all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by . . . the making of payments to or for the account of such customer . . . insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee." (emphasis supplied)); 15 U.S.C. § 78fff-3(a) ("In order to provide for prompt payment and satisfaction of net equity claims of customers of the debtor, SIPC shall advance to the trustee such moneys, not to exceed $500,000 for each customer, as may be required to pay or otherwise satisfy claims for the amount by which the net equity of each customer exceeds his ratable share of customer property . . . ." (emphasis supplied)). The defendants argue that SIPA's emphasis on the prompt payment of customer net equity claims stands in direct conflict with disallowance of those same customers' claims under section 502(d), which prohibits payment of net equity claims until after the defendants' liability for avoidable transfers is adjudicated and paid. In particular, the defendants contend that SIPA's provisions speak in mandatory terms – e.g., "shall promptly discharge" – that conflict with section 502(d)'s equally mandatory "shall disallow" language. See Ames, 582 F.3d at 430 ("[T]he mandatory terms in which section 503(b) is drafted, requiring courts to allow requests for administrative expenses, suggest a conflict with section 502(d)'s equally mandatory disallowance of claims.").

This supposed conflict, however, is not as clear as the contradiction identified in Ames between section 503(b) – which states that administrative expenses "shall be allowed" after notice and a hearing – and section 502(d). That is, the Trustee's obligation under SIPA to "promptly" make net equity payments is not inherently incompatible with the temporary disallowance provided for by section 502(d). One can imagine a reading of "prompt" that means merely that the Trustee may not delay in disbursing each customer's net equity claim once that claim is fully and finally determined. To the extent that adjudication and payment of avoidance claims may affect the final calculation of a given customer's net equity, section 502(d) does not unduly delay the Trustee's payment of that customer's net equity claim.

More fundamentally, section 502(d) functions as an ordering provision. Its fundamental logic is that the estate should receive the property due to it before a liable creditor of the estate may obtain payment on its own claims. See Matter of Davis, 889 F.2d 658, 661 (5th Cir. 1989) ("The legislative history and policy behind Section 502(d) illustrates that the section is intended to have the coercive effect of insuring compliance with judicial orders."). The same interest in coercing compliance with court orders remains in the context of a SIPA liquidation as it does in an ordinary bankruptcy, and the Court perceives no logic in SIPA (or the securities laws in general, for that matter) that undermines that basic rule of bankruptcy procedure. Indeed, at the liquidation

stage, it would be inequitable to allow customers who effectively owe money to their fellow customers to be permitted to retain those funds and at the same time receive payments from the estate, especially where it seems unlikely that customer net equity claims will be satisfied in full.

That SIPA does not envision such a scheme is illustrated by section 78fff-2(c)(2), which provides that "[t]he trustee shall deliver customer name securities to or on behalf of a customer of the debtor entitled thereto if the customer is not indebted to the debtor." 15 U.S.C. § 78fff-2(c)(2) (emphasis supplied). This provision suggests that customers entitled to receive specifically identifiable securities receive treatment similar to that which section 502(d) provides for creditors. Moreover, this provision shows that even though one of SIPA's statutory purposes is the delivery of customer name securities "as promptly as possible after the appointment of a trustee," 15 U.S.C. § 78fff(a)(1), such prompt delivery may be delayed under SIPA when a customer owes a debt to the estate. To the extent that SIPA allows for the delay of the return of actual securities to customers of a broker-dealer — a concern at the heart of SIPA's protections — it would make little sense that SIPA would sub silentio preclude such a delay of the return of customer funds more generally.[2]

---

[2] This Court previously found that section 78fff-2(c)(3), which deems customers to be creditors of the estate "the laws of any State to the contrary notwithstanding," conflicts with section 502(d). See Katz, 462 B.R. at 456. Having engaged in further review of this

Alternatively, the defendants seek refuge in the expressio unius est exclusio alterius canon of statutory construction. See United States v. Smith, 499 U.S. 160, 167 (1991) ("Where Congress explicitly enumerates certain exceptions . . . , additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (internal quotation marks omitted)). They note that SIPA contains a list of "conditions" and "exceptions" to the payment of net equity claims and SIPC advances. See 15 U.S.C. § 78fff-2(b) ("Any payment or delivery of property pursuant to this subsection may be conditioned upon the trustee requiring claimants to execute, in a form to be determined by the trustee, appropriate receipts, supporting affidavits, releases, and assignments . . . ."); id. § 78fff-3(a)(1)-(5) (setting out exceptions and limitations on the receipt of SIPC advances). According to the defendants, the existence of these express exceptions indicates that any conditions not included on such lists — including the return of avoided transfers to the estate — should not be read into SIPA.

However, the expressio unius canon applies poorly to the face of SIPA. The provisions at issue do not provide a list of, for example, statutory provisions that create exceptions to SIPA's

statutory language, the Court now concludes that section 78fff-2(c)(3) merely creates a legal fiction that permits the Trustee to pursue transfers of customer property to customers under the avoidance provisions of the Bankruptcy Code. See, e.g., 11 U.S.C. § 547(b)(1) (requiring that a transfer avoidable as a preference be made "to or for the benefit of a creditor"). This provision thus raises no issue with respect to section 502(d).

prompt payment requirement and that exclude section 502(d) from their ranks. Section 78fff-2(b)'s limitations relate only to the mechanics of filing an approved claim, not to the overarching scheme of the bankruptcy proceeding as a whole. Likewise, section 78fff-3(a)'s exceptions focus on the categories of customers who are never eligible for a SIPC advance, not the conditions under which such an advance may be withheld temporarily. Since SIPA otherwise incorporates chapter five of the Bankruptcy Code, it would make little sense to apply the expressio unius canon to preclude the application of section 502(d) without a clearer indication that Congress intended to do so.

Finally, the defendants contend that the equities weigh against the application of section 502(d) in these proceedings because disallowance of customer claims double-counts customer withdrawals: first, against their net equity calculation, and second, as the basis of a disallowance claim against them. However, assuming that the defendants eventually do return any transfers for which they are liable to the estate, they would at that point likely be entitled to a recalculation of their net equity claim, erasing any potential double-counting. See 11 U.S.C. § 502(h). And, in any case, "[w]hat the Bankruptcy Code provides" and SIPA does not preclude, "a judge cannot override by declaring that enforcement would be 'inequitable.'" Sunbeam Products, Inc. v. Chi. Am. Mfg., LLC, 686

F.3d 372, 375 (7th Cir. 2012).[3] The Court thus rejects the defendants' contention that equity demands a different result in this proceeding.

In sum, the Court concludes that there is no irreconcilable conflict between section 502(d) of the Bankruptcy Code and SIPA such that section 502(d) should not apply to SIPA liquidation proceedings. Accordingly, in its February 13, 2013 Order, the Court denied the defendants' motions to dismiss to the extent they rely on the inapplicability of section 502(d) to SIPA proceedings. Except to the extent provided in other orders, the Court directs that the following adversary proceedings be returned to the Bankruptcy Court for further proceedings consistent with this Opinion and Order: (1) those cases listed in Exhibit A of item number 155 on the docket of 12 Misc. 115; and (2) those cases listed in the schedule attached to item number 468 on the docket of 12 Misc. 115 that were designated as having been added to the "section 502(d)" consolidated briefing.

SO ORDERED.

Dated: New York, NY
June 30, 2014

JED S. RAKOFF, U.S.D.J.

---

[3] One situation in which the equities may suggest a modified outcome is where the defendant is itself a bankrupt entity and cannot pay the amount for which it is liable, in which case a set-off of the amount owed might be more appropriate than disallowance of that customer's claim entirely. See In re Shared Technologies Cellular, Inc., 293 B.R. 89, 98 (D. Conn. 2003). However, the Court need not decide that issue now, as this consolidated briefing does not speak to those particular facts. Moreover, determination of whether such a modification of section 502(d)'s command is appropriate should await a final adjudication of a given defendant's avoidance and recovery liability and consideration of its individual circumstances.